490855 Ted Orzehoskie v. Robert S. Katz Appellant Andrew Kelly Affiliate Charles Hughes Craig Unrath Mr. Kelly Good morning, your honors. As you already know, my name is Andrew Kelly. I'm from the law firm of Wilder Corwin Kelly, LLP, in Bloomington, Illinois. I do represent Ted Orzehoskie, who is the special administrator of the estate of his wife, Jennifer Orzehoskie. This appeal comes as a result of a jury trial that was tried for seven days in Bloomington, and at the close of the plaintiff's case, the trial court directed a verdict in favor of both defendants, largely on the absence of causation evidence. I'm here today asking this court to reverse the ruling of the trial court with respect to the barring of certain evidence, and ultimately the directed verdict, which flowed almost entirely... When was the motion to exclude the testimony heard? The motion was actually heard at the time that Dr. Thomas, who was plaintiff's expert in the case, was on the stand. The testimony was being elicited during the trial, which was in March of 2009, and it was at that time that an objection was raised in order to bar him from eliciting certain opinions with respect to causation. Largely the opinions were with respect to his opinions, which had been known throughout the litigation as the staging of the cancer, and in addition to the prognosis and the treatment with respect to that prognosis and the stage of cancer that she would have had, as to whether or not it would have changed, or whether or not it would have affected her course or the outcome. As I indicated, this is a complex case, and it flowed from Jennifer Orzechowski's death at the age of 27 from Hodgkin's lymphoma. In the case, essentially what we had was two competing experts. One was Dr. Gregory. She was actually the treating oncologist of Jennifer Orzechowski, but she was also an employee of Rush Hospital, which was a defendant in the case, and was the Rule 213 F2 and F3 witness of both of the defendants in the case. She was called prior to plaintiff's expert, Dr. Robert Thomas, as an adverse witness pursuant to Supreme Court Rule 237, and her testimony was presented, and at that time she offered opinions with respect to what she believed the stage was, which is at least of some importance with respect to this appeal. Jennifer was diagnosed with a stage 4 Hodgkin's lymphoma, which means that it had spread to various organs throughout her body. It's the most advanced stage of Hodgkin's lymphoma. Dr. Gregory's opinion was that in October of 2000, which is when plaintiff's expert indicated that the cancer shouldn't at the very latest have been found, Dr. Gregory's opinion was the cancer was at least a stage 4 then, or at least an advanced stage, meaning that it was a bulky tumor and would have required advanced treatment. She'd already provided those particular opinions, but she'd also indicated though that she couldn't rule out the fact that it was a stage 2, which in actuality was the opinion of plaintiff's expert, Dr. Robert Thomas. His opinion was that if someone had done the scan, which they should have done, in reference to Dr. Katz, the defendant in the case, they would have not only seen the cancer, but it would have been an earlier stage. In his opinion, it would have been an earlier stage, and one of the things that's at issue in this particular litigation is the fact that he was not entirely certain as to what the earlier stage was, in terms of the progression of the disease, but his opinion all along had been that it was an earlier stage. One of the things that Dr. Gregory had testified about prior to him hitting the stand was the fact that, in her opinion, the progression of Jennifer Orzechowski's cancer never went from stage 1 to stage 2 to stage 3 to stage 4 like you might expect. Instead, it went from stage 1 to stage 2 and right from stage 2 to a stage 4, the most advanced type of cancer. At the time of trial, the defendants raised an objection to Dr. Thomas being able to testify with respect to what the stage was and how the treatment would have changed, and he made this at the urging of the defendants, based on the fact that the defendants had, during the deposition testimony of Dr. Thomas, he had conceded a couple of things, and one of the things he conceded was the fact that with respect to the staging of the cancer, he did not know the exact progression of how the cancer had grown, whether it had gone from stage 1 to stage 4 or stage 2 to stage 4 or stage 3 to stage 4. He didn't know that, and one of the things that he said was that he would defer to a hematologist with respect to that point, but his testimony had always been that it was a lesser stage, and when I say it's always been, his testimony at deposition was that he always believed the cancer would have been a lesser stage if diagnosed in October of 2000. In fact, he also did the Rule 2-622 Certificate of Merit in the case. We're talking about a four-month period of time, aren't we? Correct. And Dr. Thomas' opinion, even with the Certificate of Merit at the initial filing of the complaint, was that the failure to diagnose that cancer back in October of 2000 not only lessened the effectiveness of treatment, but allowed it to increase in stage. Was there some question as to what he meant by, in his best medical judgment, as compared to a reasonable period of medical certainty? Dr. Thomas did indicate that he deferred with respect to certain aspects of staging, but when asked, I'm sorry, I apologize, Justice McCullough, I think your question was related to whether or not he was speculating. There was some discussion at his deposition, and it was also brought up in the offer of proof at trial, is it speculation, Dr. Thomas, as to what exactly her stage was in October of 2000? And his answer was, sure, it's speculative, because nobody knows exactly what it was, because nobody diagnosed it then. But what he said, and I think what you alluded to, Justice McCullough, is the fact that what he said was his opinion that it was a lesser stage in October of 2000 was based somewhat on speculation, but also on a number of amounts of evidence that he had reviewed in terms of the medical records and his own experience and training in the case. And in addition to that, he indicated it was based on his best medical judgment. And this is an individual that not only treated patients that had the same types of affliction as Jennifer Warzahowski, but had also treated people that clinically he'd diagnosed with Hodgkin's lymphoma and later were diagnosed pathologically with that same disease. He indicated it was... Justice, we don't all get the record in these cases, and I have a question. I intend to read the record when I receive it. But Katz takes the position that the testimony is because Jennifer's outcome and treatment would have been precisely the same regardless of when she was diagnosed. And in your brief, you argued that Dr. Greger actually testified that the treatment and outcome could have differed. Correct. But there's no citation to any place in the record. The actual citation to where she said that is volume 16 at page 106. Thank you. And what Dr. Greger indicated... First of all, Dr. Greger indicated her opinion was it was a stage 4, at least advanced disease, would have had the same treatment whether it was caught in October or February. But one of the things she also said was she didn't know exactly what it was and she couldn't rule out that it was a stage 2. The treatment that comes with these types of things is if someone gets diagnosed as a stage 4, they get chemotherapy, 6 to 8 cycles of it, and they get radiation. If it's a stage 3, it's generally the same thing. Jennifer was never a stage 3, so it's really not of importance to this appeal. How can they tell it never was a stage 3? Stage 3 requires disease both above and below the diaphragm, and she never had that. She didn't even have it when she died. Right. Instead what she had was it was invading other organs, which is what makes you a stage 4. And that was what she was at the time. And that's what being non-contiguous means? Essentially the way a Hodgkin's versus a non-Hodgkin's is a Hodgkin's grows contiguously. It will spread from other organs. It doesn't pop up in the brain or other parts of the body. It grows contiguously, unlike a non-Hodgkin's lymphoma, which can spot up in various areas. Thank you. And so that was one of the reasons that Dr. Gregory was able to say with certainty that she was never a stage 3. The treatment with a stage 2 is, Dr. Gregory indicated that, and she actually indicated two things. There was a question of fact with respect to this. When the defense asked her questions, she said she would have given the same treatment. She would have given four cycles with an additional two to get up to a total of six, which is ultimately the same treatment that she had when diagnosed as a stage 4. When I was asking her questions on behalf of the plaintiff, one of the things she stated, which was the citation I gave you, Justice Myers-Kopp, was that if she had been diagnosed as a stage 2, she would have given her last treatment. She would have given her four to five treatments, and depending on how bulky, basically how big the tumor was, she may not have even needed radiation. And the reason that's important to this particular case is, ultimately with Jennifer, she had a very aggressive cancer that came back in the following March after she was diagnosed. She had to undergo additional therapy, and again, it was an aggressive therapy like the first one. And at the time of her death, there was no active cancer. What she died from was a result of all these side effects of all the various treatments that she had. And that's why Dr. Thomas' testimony and the barring of that testimony is so crucial to this particular case, because what Dr. Thomas' testimony was, was even separate and apart, whether she was a stage 2 or a stage 4 if she had been diagnosed in October of 2000. His opinion was, one, the treatment might have changed, it might not have, but the big thing was, her body, if it had less cancer, would be better able to tolerate all of the treatment that she received. And Dr. Gregory said the exact same thing, which is, less aggressive treatment is better tolerated, the less cancer someone has, the better. And the reason it's the better is because their body is much more able to cope with all of the chemical agents, if they get radiation, those radioactive agents that they receive in order to fight the cancer. So just based on that testimony alone, Dr. Thomas had opinions that were known to the defendants throughout the case. They were opinions to a reasonable degree of medical certainty. Is that what the doctor said? Dr. Thomas said to a reasonable degree of medical certainty? Yes. His testimony was to a reasonable degree of medical certainty. If you look at the record at Volume 11, page 25, he was asked to give his testimony with respect to a reasonable degree of medical certainty and to those questions that he was uncomfortable giving opinions to that degree, he was to let us know. And that's how he gave opinions, not only throughout the direct examination that was performed by the plaintiff, also by the defendants in cross-examination, and also in the offer of proof, and he said that continuously. Is that what the trial court thought happened? The trial court thought differently, and there's basically two things that the trial court mentioned in its analysis in terms of barring the evidence that Dr. Thomas would have set forth with respect to stage and prognosis and treatment. The court basically decided two things. One, that Dr. Thomas' testimony was speculative, and number two, that he deferred to Dr. Gregory in terms of what the stage was in October of 2000. And neither one of those things are true, and the record supports the plaintiff's position with respect to both of those issues. The court found, with respect to the speculation issue, that he was speculating his opinions were not to a reasonable degree of medical certainty. And I've already indicated that his testimony was, and he indicated it was, being given to a reasonable degree of medical certainty. With respect to the very issue of stage, which is where the speculation sort of came in, what stage was she in October? He indicated it may be speculative, just as Dr. Gregory had indicated the same thing. It's impossible to know exactly what it was in October of 2000. Nobody knows for certain because it wasn't diagnosed then. So what we have is these two competing experts using their best medical judgment as how this cancer arose, how quickly it came forward in symptomology, how it responded to treatment, how quick did that kind of cancer grow throughout the various stages. Did the death certificate say anything about why the cause of her death? I think what the death certificate said in terms of cause of death was sepsis. It was basically a reaction from... She developed toxicity from both the chemotherapy agents, largely one called bleomycin, and she also developed toxicity from the radiation that she received. She had radiation five doses within her lung. And ultimately that was, I think, what the death certificate indicated. As I mentioned before, she didn't have active cancer at the time, she died from the treatment. To get back to the speculation, Dr. Thomas indicated it was speculation-based, comma, I think, comma, on a number of amounts of evidence and my best medical judgment. That's volume 11 at page 69 to 70. That was his opinion with respect to stage. And he's a physician, he's not a lawyer, and we obviously use speculation in a different word or a different way than a layperson or even a physician may use it. I think he was just being honest when he used the word speculation because he said continually, we don't know exactly what she was. Dr. Katz didn't diagnose her in October as I think she should have. He also went on to say, as I indicated at volume 11, page 25, that his testimony was being given on a reasonable degree of medical certainty and that included his opinion as to what the stage was. He said in his deposition, he said it again at trial, he always believed it was an earlier stage and in terms of progression, he didn't know what it was. But after Dr. Gregory had testified, he knew that she went from a stage 3 to a stage 4, or from a stage 2 to a stage 4 and was never a stage 3, and he was able to say she was a lesser stage and based on what Dr. Gregory had provided to the court previously, the prior stage she was was this stage 2 that Dr. Gregory says she would have been. Am I wrong? Did Dr. Gregory testify that Jennifer died from a reaction to that chemical and that she would have died even if she'd only had one treatment? I don't know if she said one treatment, but she certainly, her opinion was that she, her opinion Dr. Gregory believed in the defense theory was Jennifer would have died anyway. She was one of those people that didn't fit into the regular mold and was going to have this reaction either way. There was some testimony in the case that she developed some issues with respect to the chemical agents at stage 2, but I think the testimony that Dr. Gregory gave was it wasn't until the 5th cycle of treatment, and again she got 6, that the symptoms manifested themselves with respect to the chemotherapeutic agents and they actually gave her only 3 of the 4 agents for the last cycle, that 6th cycle. So is there anything that counters that testimony that even if she'd had the lesser treatment of the chemo, she would have died from it? Did Dr. Thomas say that? Right, yeah, and I think that that testimony came in as a combination through Dr. Thomas' testimony and through Dr. Gregory's, which is if she was a stage 2 when diagnosed in October of 2000, which was Dr. Thomas' opinion, if she was a stage 2, based on Dr. Gregory's own testimony, she would have got less chemotherapy. She would have got 4 or 5 cycles as opposed to 6 cycles. But Dr. Gregory said that the 4 or 5 cycles would have killed her. Well, Dr. Gregory... Excuse me if I sound crass, but I don't mean to. I understand what you're saying, but Dr. Gregory's opinion was she was going to have this response either way. The question is really though, if we look at the response Jennifer had, she did not have a response after 4 cycles. It was not until the 5th cycle. So if she had been diagnosed as a stage 2, even under Dr. Gregory's own testimony, she wouldn't have had toxicity at that point. Did Dr. Gregory explain her statement? I mean, is there a delayed response to this chemical? I think what she indicated was it can build up over time. But I think a lot of it goes back to what Dr. Thomas' opinion was, which was she had so much active cancer by the time she was diagnosed, they needed to do a lot of chemotherapy, they needed to do a lot of radiation. And if she'd had less therapy, her body would have been better able to withstand not only the chemotherapy, but also the radiation. And that was an opinion that Dr. Thomas held and was not allowed to provide the jury because it was barred. Do you have any cases where this has happened in the middle of the trial? I've not found one. It was an unusual situation because essentially what happened was the trial court barred the very evidence we needed in order to get to the defense case and then directed a verdict based on the very absence of evidence that the trial court had just barred. It was a very unusual situation from that standpoint. But to go back to your prior question, you're going to hear from the defendants when I sit down that it would have been the same outcome, exactly what Dr. Gregory said. She would have had the same treatment, she would have had the same outcome, no big deal. There's no negligence here, there's no causation. That's not what the case law holds. And the case that I think is most on point is the case of Waziak v. Cash. It's 278 Illab III, 901. And it's the case that says in a lost chance case, which is a case just like this, where essentially what the plaintiff is saying is that I lost a chance to try to survive this cancer. All that the plaintiff needs to show in terms of establishing proximate cause is evidence to a reasonable certainty that the negligent delay in diagnosis lessened the effectiveness of the treatment or the chance of survival. And throughout the papers, and I know you've had those before you, both Dr. Thompson and Dr. Gregory indicated there was a drastic change in survival for an individual diagnosed at a stage 2 versus a stage 4. Anywhere from 80% to 50% is the chance in survival. That's just based on the statistics alone. Dr. Thomas' testimony throughout had been the fact that if there was less cancer, she would have been able better to withstand the treatment, which would have basically the negligent delay lessened the effectiveness of the treatment because she was less able to withstand it. And Dr. Gregory echoed these sentiments when she testified that less aggressive therapy, the better, the less cancer, the better the chance of survival. And I don't think anybody in this case disputes the fact that from the timeframe, the four months that Justice McCullough mentioned, from October of 2000 to when she was ultimately diagnosed in February, there would have been more cancer. The testimony in the case, Dr. Gregory indicated it, was that the cancer does not grow backwards. It only gets bigger. I've run out of my time. I'll be back up again for rebuttal. Thank you again. And again, I'm asking you to remand this for a new trial and reverse the trial court's decision barring this evidence. Thank you. Thank you, counsel. Who will be arguing first? Mr. Hughes. Thank you. Good morning. Good morning. Please report, counsel. Judge Myerscough, congratulations on your recent nomination. We'll see. I think it's an honor to be nominated under any circumstance. Let me start by pointing out a couple of things. Who are you? I'm sorry? Who are you? I am Charles Hughes, Your Honor. I represent Dr. Katz. Thank you. This is not a legally complex case. The law is really well set out in a variety of cases. It is not a factually complex case in the sense that we have a full record to work from. It is a somewhat complex medical case, no question about that. But the issues that are before this court, I believe, are really relatively straightforward and simple. This is not a case of competing experts. There was only one expert in this case, and that was Dr. Stephanie Gregory, who is an eminently qualified specialist in the treatment of lymphoma and was the treating physician for Ms. Korzahowski. You asked the question, was this testimony given, Judge McCullough, in the reasonable degree of medical certainty by Dr. Thomas? Well, the answer is Dr. Thomas was asked that question. He said he would give his testimony to a reasonable degree of medical certainty. But he also then gave the testimony where he admitted that his testimony was speculative to a reasonable degree of medical certainty. In other words, he cannot disavow the testimony that he gave directly in response to a number of questions which I asked in his discovery deposition. And I want to point out to the court that part of Judge Drzewski's ruling in this case was not just the testimony given in trial or the offer of proof, but rather it was testimony given in his deposition, which was very direct. And there were 213 objections made when counsel tried to elicit opinions and qualifications which Dr. Thomas had expressly disavowed during the time of his discovery deposition. So in answer to Judge Myers' question about when was this raised, we took Dr. Thomas' deposition on January 18, 2007. Two weeks later, we filed our motion for summary judgment, pointing out that Dr. Thomas' testimony did not close the causation gap. So literally two years or more before the trial, we had already said to everyone involved, this testimony does not reach the level appropriate to establish causation. You have to admit it's unusual you didn't file a motion in limine to bar his testimony. We did. I think that was argued as well. And I don't have that entire record right in front of me. Was the motion in limine denied or taken with the case? It was taken with the case. What happened is we argued the motion for summary judgment, which clearly encompasses these issues, not long before the trial. In other words, the motion was filed, counsel asked for an opportunity to re-depose Dr. Gregory and was given an opportunity to re-depose Dr. Gregory, and thereafter the case was set for trial, motion for summary judgment was scheduled, the trial was canceled, the motion was canceled, and we then argued the motion, I believe it was about three months before the actual trial. Now, I've got to tell you, it was several years ago, and I've slept in a couple of nights since then, so my dates may not be exact, but I believe that was the procedure. The court denied the motion for summary judgment, and it was based in part on what counsel represented would be the testimony of Dr. Gregory. And it was probably an appropriate ruling on the motion for summary judgment, but when we got to the directed verdict motion, the court had before him, because Dr. Gregory testified literally immediately prior to Dr. Thomas, that the trial court, Judge Kaczewski, knew exactly what the opinions of Dr. Gregory were, and Dr. Gregory's opinions were unequivocal. She felt very clearly that as of October 26, 2000, which is the only date on which a breach of the standard of care was identified, that Jennifer Orzechowski had either, well, she had what she termed an advanced cancer, an advanced stage of cancer. It was either a 2B, which means bulky, or it was a 4. Either way, and this is a critical point, either way her treatment was going to be exactly the same as it would have been in February when the diagnosis was made, and further, the outcome was going to be exactly the same. This is clear and unequivocal testimony by Dr. Gregory. Now didn't Dr. Gregory testify that Jennifer would have received less chemotherapy if diagnosed as a stage 2? Interesting that you should ask that. I happen to have that right here. Dr. Gregory was asked by plaintiff's counsel, by Mr. Kelly, in effect a hypothetical. Here it is. Question. If Jennifer had been a stage 2 and she had not had bulk, the indications would be that she would probably not have radiation, would have had lesser chemotherapy. Do you agree with me? Answer. If she was a stage 2 and she did not have bulk, you often would include radiation to that too. I would just give less of the chemotherapy doses. But Dr. Gregory went on to say this was not her opinion at any time. Where in the record is that? That is the same, actually it's what counsel cited to you. It's volume 16 at pages 105 to 169. At no time did Stephanie Gregory ever suggest that this was a stage 2 in October. She in fact felt quite the contrary and made it very clear that she felt this was a cancer which had progressed to an advanced stage. And by the way, the B designation stands for the bulk. In other words, this had already had enough mass that it was going to require a full cycle of treatment. It's important here to note as well. But didn't Thomas also testify that even if it were a full cycle of treatment, she would have had a better chance of surviving had she gotten it four months earlier? Thomas disavowed the qualifications to suggest anything with respect to either treatment differences or outcomes. What Thomas said when questioned in his deposition was that he is not qualified to give those opinions. He had to defer to an oncologist. Well, the only oncologist who testified in this case was Dr. Gregory. So at best what Thomas said was maybe, possibly, but I have to defer to an oncologist. And the oncologist who testified, again the only one who testified in the plaintiff's case by the way, said very clearly no, treatment would not have changed. And by the way, this idea, what counsel wants us to do is speculate and then build on the speculation. If this was a stage two, maybe she only would have had four cycles of treatment. And maybe she would have lived. Maybe the outcome would have been different. Well, that is the definition of speculation. And that is all the testimony at best that Dr. Thomas produced. Did Dr. Gregory, was she asked or did she respond to anything, to that question also? I'm sorry, to which question? If Jennifer had received this treatment four months earlier, would she have stood a better chance of surviving? Dr. Gregory was very clear. It wouldn't have made any difference. She would have received the same treatment if this had been diagnosed in October as she received in February of 2001. The treatment would not have changed. And she would have died. Yes, she would have died. And actually, this is where having tried the case is an advantage, but the reality is the testimony was that everybody gets a minimum of six doses of treatment. Whether it's stage two or stage four? Well, when it gets into any kind of a, any bulk at all, everybody gets at least six stages. They reassess the patient at four, and then the decision is made whether to go to six or eight. But it's always a minimum of six treatments. And Dr. Gregory was very, very clear and could not have been more clear. This patient was always going to receive this protocol, and this protocol called for a minimum of six cycles of therapy. And it is the therapy which caused the death here. There's no question. And you asked a very pertinent question earlier, which is how do we know when this has become toxic? And the testimony from Dr. Gregory is you don't know right away. This could have become toxic after the first or second cycle, but we didn't know until she was at her fifth cycle because it's a delayed response by the patient's physiology. And there's no claim of negligence in the administration of this threat? Absolutely not. Absolutely not. She received superb treatment. Now, I'm just a little confused about the relationship between the two defendants. Did she go to Chicago for this treatment? She did. Actually, Dr. Cass is from Chicago. Dr. Cass is from Chicago. When he discovered the lymphoma or what he suspected was a lymphoma in February, he immediately referred her to a surgeon, and then she was immediately referred to Dr. Gregory for treatment. And, again, this is a treating. This is no speculation. This is a treating oncologist with superb credentials who specializes in the field of lymphoma who has given the opinions that Dr. Thomas expressly disavowed the qualifications, the training, or the experience to give. He was pressed hard in his deposition, and each time he backed away. He said, I can't make that opinion. I can't give an opinion as to stage. If I did, it would be speculation. I have no opinion as to whether the treatment would have changed. I have no opinion as to whether or not the outcome would have changed. That's what we had at the end of that discovery deposition. As I say, the deficiencies in that testimony were pointed out very early. I think Mr. Kelly thought he would get better testimony from Dr. Gregory, but she said exactly what her opinions were in her discovery deposition, that this patient will always have it. And the B symptoms, which make this a 2B, by the way, are shown by the patient's symptoms in the months prior to recognition of the cancer, and they are all over the record, according to the plaintiff, because that's what they're saying should have been recognized by Dr. Katz. At no time could Dr. Katz have recognized this and prevented it, and Dr. Gregory is very clear that from a causation standpoint, she was going to receive exactly the same treatment and have exactly the same outcome, even though there was a 4-month window that didn't make any difference. I assume there's no test that can be given to determine whether patients will have this reaction to the medication? Evidently not. First of all, lymphoma is not a common disease, and secondly, and this was one of the tragedies in the case, you have a patient, a young, active woman who has an unusual condition, and it's replete in Stephanie Gregory's testimony, then all of a sudden she has this horrible reaction to the very drugs that are being used to cure her, and which ultimately caused her death. It's a rare instance, then coupled with another rare instance. It's a tragedy in every sense of the word, but it's not the fault of any physician, nor did any conduct of the physician cause this death. She received, as I say, she received superb treatment. So this basically comes down to the testimony of Thomas is she would have stood a better chance had it been diagnosed and treated timely, but then he defers to the oncologist as to treatment, and the treatment is the same as it would have been, and the oncologist doesn't say she stood a better chance of survival. The person who has the knowledge and experience. But more importantly, if you look at Dr. Thomas' testimony, this is very clear in his discovery deposition. I asked him, Doctor, so what you're telling us is earlier is better than later. Is that correct? He said, yes. But you can't in any way quantify how much better, how much earlier in any way. He said, absolutely not. That would be speculation. And he said, I have to defer to an oncologist. This was not an idle pursuit on my part. I went after the guy, and he was honest in his responses. He did not have the qualifications to say that. The testimony of Dr. Thomas would be the same if Dr. Thomas were talking about discovering this on February 15th. In other words, 24 hours before it was actually discovered on February 16th, because his testimony would be equally applicable. It's earlier is still better than later, but that doesn't close the causation gap. And it truly is a causation gap in this case. The testimony is set out in length in the briefs, and I don't want to review that other than what I have, but it's well set out. And the plaintiff only gets to his argument that the treatment would have changed if by some miracle there is testimony that the stage was just a stage 2, and there is no competent testimony that's a stage 2. All the testimony is that it is an advanced stage 2B or 4. That's why this is pure speculation. I'm going to defer now with leave of court to Mr. Unrath. Thank you. Thank you, Mr. Hughes. Mr. Unrath. Thank you very much. My name is Craig Unrath, and I represent the Russia Presbyterian St. Luke's Medical Center. At the outset, I'd just like to clarify any confusion as to why I'm here. I'm not confused. Okay. Dr. Katz is claimed was our agent. He's not officially an employee of Rush but worked in our medical center. So we're here on an agency theory. Right at the outset, I want to clarify just a couple of points raised in opposing counsel's argument and responded to by Mr. Hughes. Counsel said that Dr. Gregory could never rule out the fact that this could possibly have been stage 2 back in October of 2000. Now, that is simply untrue. And Mr. Hughes pointed out when you read the deposition or the transcript, you'll see that she is responding to a hypothetical question. She's asked, what if she was not bulky? What if she was stage 2? In that case, would she have received lesser treatment? And Dr. Gregory said, yes. Now, of course, on redirect, they said, was she stage 2? And she said, no, absolutely not. She had advanced stage lymphoma. And Dr. Gregory repeatedly defined advanced stage as either stage 4 or stage 2B. Now, she was asked point blank, to a reasonable degree of medical certainty, what stage was she in in October of 2000? And Dr. Gregory point blank responded, I believe she was, to a reasonable degree of medical certainty, stage 4. She said there's a chance she could have been 2B. But I think it's more likely she was a stage 4. Stage 2B and stage 4 received precisely the same treatment. Now, pardon me, how did she know this? One thing that the counsel pointed out in the brief, that the judge just took two experts and chose one of them. He said that Dr. Thomas said that it was stage 2, in his opinion, and he chose Dr. Gregory. Why? He said that's inappropriate. Well, there is a reason why Dr. Gregory knows this. And that's because after she had first seen Ms. Orzechowski, she referred him to a radiologist. Now, every step of the way, she's being asked to fill out a medical history. What are all your symptoms? And she had quite a few. It wasn't until she saw this radiologist, long after the diagnosis of lymphoma had arrived, that she pointed out that she said, you know, back in June and July of the previous year, she goes, I really had a problem with night sweats. Now, Dr. Gregory focused in on that, and she said, to me, that seals it. To me, that tells me one thing, that she had advanced stage lymphoma in June or July of 2000. We're not even dealing with October. So it's not just as though the trial court flipped a coin and said, I'm going to go with Dr. Gregory. Dr. Gregory had specific reasons why she believed that she was in an advanced stage of lymphoma. May I ask a question? Sure. In the brief of the appellant, depending on the bulk of cancer at diagnosis, Jennifer may not have needed radiation. That's Dr. Gregory's. Is that what she said? No. My recollection is that she was responding to a hypothetical. That dealt with only stage two? Right. If she was stage two, if it was not bulky, she may not have received radiation. And she said yes, under that hypothetical. But she never testified that that hypothetical was the actual case here. Now, Justice Myers, you had asked about the timing on this. Just maybe if she had been treated earlier, even if it was stage four, wouldn't that have made a difference? And had she died of lymphoma, we might have something there. I don't know. I'm not going to say one way or the other. But she didn't die of cancer. She died of toxicity to the treatment. And Dr. Gregory, I thought it was a very pointed remark. She said that Pamela R. Zahosky had the worst of all worlds. She had an aggressive cancer and coupled with toxicity to the only treatment that could save her life. She went through her first five cycles of chemotherapy. That's when the toxicity revealed itself. They took out the bleomycin and continued with the sixth treatment without the B. And she went into remission. It came back. And it came back almost immediately. In the end, they did eliminate the cancer from her body. What killed her was the toxicity to that bleomycin. And there was no way that anyone could have predicted that. I see my time is up. Thank you very much. Thank you, counsel. Roberta? Could you read to me what it says? Do you have the ability to in volume 16 at 105? I don't have that before me, but that's Dr. Gregory's testimony I think you're asking about. Depending on the bulk cancer diagnosis, Jennifer may not have needed radiation. We've all been giving our interpretation of what the record said. I don't think anyone's been able to read precisely what it is. But what I recall from that, I asked the questions, was I asked Dr. Gregory, is there any way you could rule out that she was a stage 2 at that time? She said, I can't say that with certainty. I can't say with certainty she wasn't a stage 2. What would the treatment have been if she'd been a stage 2 at that time? And her testimony was, I would have given four or five cycles less chemotherapy. And then I asked her separately about radiation. Would you have also given radiation for someone as a stage 2? And she said, probably, but in some instances, you don't need radiation, depending on the bulk of the tumor at that time. The thing that dictates whether you do radiation is how much bulk is there. And it just depends on how big is that tumor when you see it. And, of course, nobody knows with respect to Jennifer. But did she testify that once it's bulky, she would have given the same treatment? Her opinion to a reasonable degree of medical certainty in this case, she said it would have been the same. She also said, though, and this is sort of why we have juries to determine what the facts are, is she also said on at least four occasions that it would have been a different treatment. For instance, she also said the same thing with respect to whether or not Jennifer might have been a stage 2. She said that at volume 16, page 102, 103, 104, 165, and 167. She said it a number of times. She said the same thing with respect to what the treatment would have been if it was a stage 2. I agree with what the defendants say is that ultimately what Gregory said was treatment would have been the same, Jennifer would have died. But there were facts that she had set forth before the jury with respect to her own medical opinions that it could have been different. What does that word ultimately mean? Pardon me? What does that word ultimately mean when you said that as to her testimony? Well, what I'm saying is she said a lot of different things, and it wasn't all consistent with respect to what was ultimately elicited, what was elicited by the defendants, I guess is what I'm saying. She said a number of different things. But Dr. Thomas deferred to Dr. Gregory as to what stage she was in October. No, the only thing Dr. Thomas deferred to, and you have to read the record to see exactly what he said with respect to that. I can find the exact citation for you. But what he said was he deferred only on the issue of what stage was it before it was a stage 4. Was it a stage 3 or was it a stage 2 or was it a stage 1? That was what he deferred to. He didn't defer on everything. He didn't defer on absolutely every single issue. He also deferred to her in the sense of what the exact survival rates were. And he said in his deposition he believed it was 90% if found as a stage 2 versus 70% if a stage 4. Dr. Gregory said it was actually closer to 80 versus 50. That's what he deferred on. He didn't defer on what the stage was or whether it was an earlier stage. That's not what he deferred on. It was not that issue. But to go back to what I was saying, Dr. Gregory testified it could have been these other things. It could have been a stage 2. It could have been a different treatment. And if you look at the case of Wilson v. Clark, it's a Supreme Court case, 84 Ilsec and 186. That's the case where the defendants wanted to offer testimony that the infection and the amputation of the individual's leg could have been avoided. And the Supreme Court said that alone was sufficient. Experts can testify about what could have, what might have. And in cases such as this, if you look at the Holton v. Memorial Hospital case, it's not absolute in terms of what the plaintiff needs to prove. We don't need to prove she would have lived. We don't need to prove absolutely there would have been a different outcome. What we need to prove is that she lost a chance. And she lost a chance because if Dr. Thomas were allowed to testify, he would have indicated she lost a percentage chance based on the fact that she was diagnosed at a later stage. And he would have said that she would have lost a chance at the effectiveness of the treatment because there was more cancer at the time she was diagnosed. She had less ability to withstand the chemotherapy and the radiation, which ultimately is what led to her death. There is no dispute as to the bulk or the stage. It was either, well, no dispute in the sense it was either stage 2 bulk or stage 4, right? I think generally that's true. I think the question is Dr. Gregory says it was probably stage 4 or it was at least a stage 2B. And the 2B, the B is a designation and it doesn't stand for bulk. What it stands for is there are certain symptoms which go along with what typically is a bulky tumor or at least a more aggressive tumor. And those are things like night sweats, you know, you can have a cough, those types of things. Those are the kinds of symptoms that you get a B association with. Thank you, counsel. We'll take this matter under advisement and recess until the next case.